**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CASE NO. 23-cr-41-TSC** |
| | : | |
| **VICTOR SIMMS,** | : | |
| **Defendant.** | : | |

**UNITED STATES' SENTENCING MEMORANDUM**

A sentence of life imprisonment should be reserved for the most heinous circumstances.  It is a sentence that should be requested only with the utmost gravity, for the most appalling crimes, and for the most dangerous offenders.  Victor Simms is such an offender whose monstrous crimes against children have spanned more than twenty-five years, leaving a trail of children sexually exploited, violated, and carrying the lifelong scars of the defendant's betrayal.[1]  A sentence of life imprisonment is the only sentence that adequately accounts for the full breadth of the defendant's crimes, the magnitude of the damage he has done, and is the only sentence that will guarantee that defendant Simms never again sexually violates another child.  The United States asks that the Court impose a sentence of life imprisonment, without the possibility of release.

I.    **Background**

For more than 25 years, Victor Simms engaged in an insidious pattern of ingratiating himself with the parents of young children in order to gain unfettered access to them and use them to turn his sick fantasies into reality. Once he gained their parents' trust, Simms repeatedly drugged

---

[1] In the Statement of Offense, Simms admitted to sexually abusing or exploiting a total of 10 children, beginning as early as 1997.   Simms was also convicted in 2005 in North Carolina for conduct involving two additional children. *See* ECF No. 110.  Further, the United States is aware of multiple other incidents in which Simms is alleged to have engaged in the sexual abuse of children.

and sexually abused these children. It was not enough for him to abuse them, instead, he took the further step of recording his abuse and using those recordings as souvenirs so that he could relive these horrific moments.   Simms is a man who has visited long term and profound sexual violence on one of the most vulnerable groups of victims – young children – and he should never be given the opportunity to offend again.

1997:  Earliest Confirmed Child Victim

Defendant Simms's offenses against children did not begin with the crimes charged in this case.  His offenses against children began more than two decades ago, when the earliest known instance of sexual abuse committed by Simms took place in 1997, against ████████████  That child, hereinafter referred to as Adult Victim 2 ("AV2"), was approximately 6 years old at the time of the abuse.  After more than two decades, Simms has finally admitted to that sexual abuse as part of the Statement of Offense in the instant case.  *See* Statement of Offense, ECF No. 110, at 9.

In 1997, at the approximate age of 6 years old, AV2 reported to her mother, ████ that Simms had sexually abused her.  ████ reported this to the police and, following an investigation in which AV2 was forensically interviewed, AV2 described how Simms had put his "bone" in her "in between."  As a six-year-old child, her developing vocabulary did not include the anatomical terms necessary to describe anal penetration.  Simms was charged with Second Degree Child Sexual Abuse in D.C. Superior Court case F-9085-97.  The court ultimately dismissed this matter for a lack of probable cause.  After twenty-seven years of being denied justice, AV2 was given long-deserved closure when defendant Simms finally admitted in the plea colloquy on May 20, 2024, that he had sexually abused ██████████ all those years ago.

More than two decades after her abuse, AV2 still has specific memories of repeated instances in which the defendant sexually abused her when she was a child. She specifically recalls at least one time in which Simms penetrated her anus with his penis when she was a child, noting "that sh** hurt." As ████ Simms should have been the person that AV2 could turn to for help if someone harmed her. Instead, he took advantage of the trust she placed in him and violated that trust in a way that continues to affect her to this day.

<u>1995 & 1999:  Repeated Allegations of Sexual Abuse by Simms</u>

Although AV2 is the earliest confirmed victim of Simms's predatory sexual behavior, the earliest known *allegation* of sexual abuse perpetrated by Simms dates back to 1995. On October 12, 1995, the Department of the Army circulated a memorandum detailing its investigation into Simms with respect to his conduct with a four-year-old girl, hereinafter referred to as ████ That memorandum addressed the allegations from August 22, 1995, in which ████ alleged that Simms, who was babysitting her at the time, pulled down her pants and licked her buttocks. *See* Gov't Ex. 1, *Army Memo Re:* ████ additionally said that Simms told her that he would "squash" her arm if she said anything about the incident. Simms denied the allegations.

Following the investigation, Simms was tried by General Court Martial on May 13, 1996, for Indecent Acts Upon a Child, Communicating a Threat, and False Swearing. He was acquitted of the Indecent Acts Upon a Child and Communicating a Threat but found guilty of False Swearing as it related to the investigation into his conduct with ████ As a punishment, his rank in the Army was reduced from E6 to E4. *See* Gov't Ex. 2, *Army Disposition*.

Just a few years later, on July 23, 1999, another child came forward alleging sexual abuse by Simms and that allegation was also investigated by the Army. This time, nine-year-old ████ told her father that, while staying with Simms, Simms digitally penetrated her vagina and anus.

3

She also reported that Simms had done this to her previously and that he had also done the same thing to her cousin. *See* Gov't Exhibit 3, *Investigation Re:* ▉ She additionally indicated that Simms had taken photographs of her while she was naked. The incident does not appear to have been prosecuted by the Army and it is unclear how the investigation was resolved.

### 2005: North Carolina Convictions Involving Two Separate Child Victims

A few years later, in 2004, defendant Simms was arrested in North Carolina after two additional child victims, both believed to be his ▉▉▉▉ by ▉▉▉▉ alleged that he had engaged in sexual conduct with them. On February 2, 2004, Simms was arrested after ▉▉▉▉ alleged that he rubbed her vagina with his fingers. See Gov't Ex. 4, *Supplemental Report Re:* ▉ Separately, on December 13, 2004, Simms was arrested again after ▉▉▉▉ lleged that he had digitally penetrated her. Simms ultimately entered a guilty plea involving both incidents. On December 9, 2005, Simms was convicted of two counts of Incident Liberties with a Child in volving ▉, in violation of N.C. Gen. Stat. § 14-202.1(a)(1), and one count of Felony Child Abuse Sex Act involving ▉ in violation of N.C. Gen. Stat. 14-318.4(a). He was sentenced to a total of 25 to 39 months incarceration, all suspended, followed by 36 months of supervised release. He was also ordered to register as a sex offender, an order which remained in place when Simms moved to Washington D.C. and committed the offenses charged in this case.

### 2008: Lifetime Sex Offender Registration Order in Washington D.C.

In 2005 Simms was discharged from the Army under circumstances "other than honorable." *See* Presentence Report, ECF No. 123, at § 149; Evaluation and Risk Assessment Conducted by Travis D. Flower ("*Flower Evaluation*"), 9/25/24, at 4. Following his 2005 conviction, Simms thereafter moved to Washington D.C. in approximately 2006, and his probation

was transferred.  Under the law in Washington D.C., Simms's North Carolina convictions required

him to register as a sex offender for life.  Simms challenged this requirement, but, on February 12,

2008, was ordered by a D.C. Superior Court judge to register as a sex offender for life based upon

the fact that he was convicted of three felonies constituting registration offense against a minor

and because his felonies involved two different victims.

Circa 2008-2010:  Additional Allegations of Child Sexual Abuse

In 2023, victim ▉▉▉ (hereinafter Adult Victim 1 "AV1") contacted law enforcement to

report that she had been sexually abused by Simms when she was a child.[2]  ▉▉▉ who was born

in 1998, was interviewed by the FBI on August 3, 2023, and reported that Simms was her "cousin's

godfather."  She explained that he was a "fun father-figure" to many children and that he would

buy her ice cream and take her and other children on "dates" to McDonalds.  *See* Gov't Ex. 5,

*Interview Summary of AV1.*

▉▉▉ recalled an incident when she was approximately 10-12 years old, between about

2008-2010, when she and her cousins stayed at Simms's apartment in Washington D.C.  While

there, ▉▉▉ did not feel well and Simms gave her a pill that he said would help her to feel better.

She later felt woozy and dizzy and threw up before falling asleep.  ▉▉▉ also recalled that, at some

point in the night, she woke up to Simms putting lotion on her feet and legs while holding a video

camera.  Her underwear was ripped and Simms was not wearing any clothing on his bottom.  ▉▉▉

also explained that she remembered Simms attempting to penetrate her during the offense.  ▉▉▉

did not report this incident to law enforcement at the time, and only came forward after Simms

was arrested in the present case in January of 2023.  *Id.*

---

[2] Simms was not charged with crimes against AV1 in the instant case, nor did he admit to the
conduct as part of the plea colloquy.

<u>2018-2022: Sexual Abuse and Exploitation of Numerous Child Victims</u>

On January 15, 2023, Simms was arrested in the instant case, which unearthed the defendant's decades-long trail of child victims. As part of the plea colloquy in this case, Simms admitted to a wide range of offenses involving twelve additional child victims, ten of whom were identified, with the offenses occurring between 2018 and 2022. For each victim Simms exploited, he engaged in a similar pattern of conduct that was as calculated as it was sinister. First, he ingratiated himself with the parents of the child and the child themselves by putting on a charade of being a "fun uncle" who could be trusted with the child. This allowed him to gain unfettered access to numerous children. Simms would then bring his child victims to places he knew were safe for him to engage in criminal conduct, mainly hotels and his cousin's residence where he was staying. He used drugs to incapacitate some of the children, but not all, to make it easier to abuse them and to ensure they had no memory of his criminal conduct. As a final act of depravation, Simms recorded the sexual abuse of these children, including anally and vaginally penetrating them, to ensure he had souvenirs of his crimes to carry with him.

On January 17, 2023, law enforcement executed a search warrant at the defendant's residence and recovered several electronic devices, including a one Terabyte SanDisk external hard drive, which documented in thousands of pictures and videos the sexual exploitation of numerous children by Victor Simms. That SanDisk hard drive contained approximately 3300 photos and over 250 videos of child sex abuse material (CSAM), the vast majority of which was produced by Simms. The photos and videos on the hard drive depicted the sexual abuse of approximately twelve children. Law enforcement was able to positively identify ten of those children. The majority of the CSAM images depict the children as they are either asleep or

unconscious, even while they are being subjected to sexual acts by Simms such as anal and vaginal penetration.

The metadata associated with these images indicated that the images were produced at Simms's cousin's home where he previously lived and at various Hilton-brand hotels in the D.C., Maryland, and Virginia area. Hotel records confirm that Simms stayed at those hotels during the time frames the images were produced.

Each of the child victims identified in the CSAM was interviewed as part of the investigation, and the majority of the children had no memory of any sexual exploitation by Simms, nor did they make any allegations of sexual abuse by Simms. Of the children identified in the Statement of Offense, MV1 was the only one to make any allegation of sexual abuse against Simms. The children did, however, all generally recall the care and attention that Simms paid to them and the times that they spent alone overnight with Simms. Additionally, MV1, MV2, and MV9 all described Simms giving them pills at various times while they were under his care, ostensibly to "help" them to sleep.

This lack of memory regarding any sexual abuse by Simms was later explained by the significant stash of controlled substances found at Simms's residence. These substances included Zolpidem, which uses the trade name Ambien, and Alprazolam, which goes by the trade name Xanex. Had this case gone to trial, a toxicology expert would have testified that Zolpidem/Ambien has both amnestic and dissociative effects. This means that Zolpidem/Ambien may cause amnesia upon waking, such that a person who has ingested this drug may be aware in the moment of what is happening but will not later recall what happened while under the influence of this drug. Relatedly, ingesting Zolpidem/Ambien may cause dissociation, meaning that a person under the influence of this drug may not be aware of their actions at the time and will not remember what

occurred upon waking. The drug Alprazolam/Xanax can have similar effects. For example, it may sedate a person, causing them to sleep more deeply and for a longer period than if in a natural sleep. Alprazolam/Xanax may also cause amnesia upon waking, in that the person who has ingested this drug may be aware in the moment of what is happening but will not later recall what happened while under the influence of this drug.

The sedative, amnestic, and dissociative effects of the controlled substances found in Simms's residence provide a compelling explanation as to why so many of the CSAM images depict the children either asleep or unconscious. Those effects also explain why most of the child victims have no recollection of being sexually abused or exploited by Simms. According to the *Flower Evaluation*, Simms explained during his interview that he "mostly drugged them [the child victims] just for the practical purpose of being able to abuse them, and he did not recall being specifically aroused by their incapacitation." *See Flower Evaluation*, 9/25/24, at 7. While there is no clear answer as to why Simms drugged many of his victims, it certainly had the effect of allowing him to abuse these children unimpeded and to avoid detection for years.

**Offenses Against Minor Victim 1**

As part of the plea agreement, defendant Simms admitted to sexually abusing and exploiting MV1, who was born in 2013, over a period of almost four years, between September of 2018 and June of 2022. MV1 looked up to Simms as a "godfather" and regularly spent time alone with him, including overnights at his apartment and at area hotels. The abuse of MV1 took place at Simms's residence and at hotels in the tri-state area, and involved different sexual acts perpetrated against MV1 throughout her childhood, including:

- On September 9, 2018, Simms sexually exploited MV1 when she was approximately 4 years old by producing a series of images that depict close-up views of MV1's vulva, a

8

video depicting Simms's penis in her mouth, and a video depicting Simms's penis in her anus.  The images were taken in Washington D.C. at the residence of Simms's cousin in Southeast, Washington, D.C. where Simms lived at the time.

- Between September 17-19, 2021, when MV1 was approximately 7 years old, Simms again exploited her by taking her to the Hilton Hotel located at the Baltimore-Washington International Airport in Maryland.  While there, he produced a series of images showing MV1 asleep or unconscious while lying next to Simms, with both fully naked and their faces fully visible.  The series also includes images of MV1's prepubescent vulva, some of which include Simms's hand spreading her vulva open.

- Between March 4-6, 2022, when MV1 was approximately 8 years old, Simms again exploited her by taking her to the Hilton Hotel at Dulles International Airport, located in Virginia, and creating another series of sexually explicit images.  One video created during that trip showed Simms anally penetrating MV1 with his penis while she lies there either asleep or unconscious.

- Finally, between June 3-5, 2022, when MV1 was approximately 8 years old, Simms took her to the Hilton Hotel located at Dulles International Airport and produced another series of images depicting her sexual exploitation.  These images show MV1 naked while Simms puts lubricant on her anus and vulva and, later, penetrates MV1's anus with his fingers.  Simms's face and body are fully visible in many of the images.

**Offenses Against Minor Victim 2**

Simms also admitted to the sexual abuse and exploitation of MV2, the cousin of MV1.  Both girls regularly spent time alone with Simms, stayed overnight at his apartment, and were entrusted to his care for trips to local hotels, ostensibly to have pool parties and to play with other

children.  With respect to MV2, Simms admitted to sexually exploiting her on two occasions, including:

- Between July 13-14, 2019, when MV2 was approximately 5 years old, Simms took MV1 and MV2 to a Hilton Hotel in Arlington, Virginia, and sexually exploited her while there. During that trip, Simms produced a series of images depicting MV1 and MV2 at the hotel with him, as well as naked in the bathtub.  He also created a series of images depicting MV2 with her legs spread, a video of MV2 being anally penetrated by Simms, and images of MV2's vulva covered in a cloudy liquid while she appears to be asleep or unconscious.

- Between June 17-19, 2022, when MV2 was approximately 8 years old, Simms took MV2 to the Hilton Hotel at Dulles International Airport in Virginia.  While there, Simms produced a series of images showing MV2 fully naked, as well as multiple images of her prepubescent vulva, including one with Simms using his finger to spread her vulva open.

### Offenses Against Minor Victim 3

As part of his plea agreement, Simms admitted to the sexual exploitation of Minor Victim 3, who is the young daughter of ▉▉▉▉▉▉▉▉▉▉▉▉  Simms was entrusted to babysit MV3 on multiple occasions and, between August 7-8, 2020, when MV3 was approximately 3 years old, Simms took MV3 to the Embassy/Hilton hotel near Baltimore-Washington International Airport in Maryland.  While there, Simms produced a series of images depicting MV3 fully naked and in different positions, including on her back with her legs spread, on her knees with her anus displayed for the camera, and close-up images of her vulva.  She is awake in these images.  Simms also filmed a video in which MV3 is dancing while Simms encourages her to "twerk" and pulls down her pants.

**Offenses Against Minor Victim 4**

Minor Victim 4 is the younger sister of Minor Victim 5 and both girls ████████████ from Simms in Southeast, Washington D.C.  The parents of MV4 and MV5 trusted Simms and permitted their children to spend time with other children who lived in the home and to stay overnight at that home, sometimes while Simms would "babysit."   Simms admitted to sexually exploiting MV4 on June 20, 2020, when she was approximately three years old, by producing a series of images in which MV4 is laying down in various positions with her vulva displayed for the camera.  She is awake in these images and Simms's fingers can be seen touching the edge of the child's underwear.

**Offenses Against Minor Victim 5**

MV5, the older sister of MV4, was sexually exploited by Simms between January 18-19, 2019, when MV5 was approximately 7 years old.  During that time, Simms produced a series of images that includes two photos of himself with his mouth on the child's exposed anus, with his face fully visible.  The same series also includes an image of MV5 with her legs spread and close-up shots of her vulva, and a video depicting an adult male penis anally penetrating MV5.  The images were produced at Simms's residence in Washington D.C., ████████████████ MV5 ██████ her little sister, MV4.

**Offenses Against Minor Victim 6**

Simms also admitted to sexually exploiting Minor Victim 6 between October 26-28, 2018, when she would have been 9 years old.  MV6 ██████ of MV4 and MV5 and encountered Simms when she would visit her cousins █████████████  Simms exploited MV6 by taking her to the Hampton Inn Baltimore/Bayview in Maryland where he sexually abused her and produced images of that abuse.  The images include closeup photos of MV6's vulva, an image

showing Simms's penis penetrating MV6's anus, and a video depicting Simms anally penetrating MV6 with his penis. In addition, the same series of images includes photos of both MV5 and MV6 together naked and in a bathtub with either bubbles or shaving cream all over their bodies.

### Offenses Against Minor Victim 8

Minor Victim 8, who is also the child of ███████████████ was sexually exploited by Simms between September 19-20, 2020, when she was approximately 9 years old. During a visit of the Embassy Suites near Baltimore-Washington International Airport, Simms produced a series of images of MV8 showing her flat on her back and asleep or unconscious in various positions, including with her breasts and vulva exposed to the camera and multiple close up images showing Simms's penis penetrating the child's anus. In several of the images there appears to be blood on the child's labia.

### Offenses Against Minor Victim 9

Finally, under the terms of the plea agreement, Simms admitted to sexually exploiting Minor Victim 9 at the Embassy Suites near Baltimore-Washington International Airport over the course of two weekends in October of 2020. MV9 was approximately 12 years old at the time. MV9, who was interviewed as part of the investigation, had no recollection of being sexually abused by Simms, but did share her fond memories of Simms buying her gifts and food throughout her childhood. She also recalled how he occasionally gave her pills to help her to sleep when she spent overnights with him. MV9 believed that those pills were melatonin, but she could not be certain.

Simms admitted to exploiting MV9 during the weekend of October 2-4, 2020, by producing a series of images of MV9 while asleep or unconscious, lying on her back with her vulva displayed for the camera, lying on her stomach with her anus exposed, and a closeup video of her vulva. He

also admitted to exploiting MV9 one week later, between October 9-11, 2020, at the same location. On that weekend Simms produced a series of images showing MV9 lying on her back while asleep or unconscious with her vulva exposed, lying on her stomach with her buttocks exposed, and a video of Simms vaginally penetrating MV9.

As discussed above, Simms committed all of the offenses against minor victims 1 through 9 while he was a registered sex offender in the District of Columbia.

**Procedural Status**

On May 20, 2024, Simms pled guilty to seven of the 38 counts in the indictment, including: (1) three counts of Sexual Exploitation of a Child, 18 U.S.C. § 2251(a), each of which carries a mandatory minimum of 25 years of imprisonment and a maximum sentence of 50 years of imprisonment; (2) two counts of Aggravated Sexual Abuse with Children, 18 U.S.C. § 2241(c), each of which carries a mandatory minimum sentence of 30 years imprisonment and a maximum sentence of life imprisonment; (3) one count of Possession of Child Pornography, 18 U.S.C. § 2252(a)(4), which carries a mandatory minimum of 10 years of incarceration and a maximum of 20 years of incarceration; (4) and one count of First Degree Child Sexual Abuse with Aggravating Circumstances, D.C. § 22-3008, 3020(a), 3020(e), which carries a sentence of up to life imprisonment without the possibility of release. This matter is scheduled for sentencing on February 18, 2025.

The United States now asks that the Court impose a sentence of life incarceration without the possibility of release. Such a sentence, while severe, is the only sentence that adequately reflects the factors articulated in 18 U.S.C. § 3553(a) and takes account of the horrific circumstances of these crimes, including the defendant's sexual abuse of multiple child victims

over the course of decades, his use of drugs to carry out his crimes and to silence his victims, and his betrayal of the children entrusted to his care.

## II.    A Life Sentence is the Only Sentence that Adequately Reflects the § 3553(a) Factors

In determining a sentence, the Court must consider the factors listed in 18 U.S.C. § 3553(a).[3]  These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and
(3) the kinds of sentences available;
(4) the applicable sentencing guidelines range for the offense;
(5) pertinent policy statements issued by the U.S. Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also United States v. Pyles*, No. CR 14-00006 (RJL), 2020 WL 376787, at *2 (D.D.C. Jan. 23, 2020); *United States v. Mitchell*, No. CR 05-00110 (EGS), 2019 WL 2647571, at *7 (D.D.C. June 27, 2019).  A district court, however, "need not consider every § 3553(a) factor in every case." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008); *see also United States v. Fry*, 851 F.3d 1329, 1332 (D.C. Cir. 2017).

---

[3] "Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), the Guidelines serve only an advisory function. *Id.* at 245, 125 S. Ct. 738. Nevertheless, even in a post-*Booker* world in which the Guidelines are not binding, the sentencing court 'must calculate and consider the applicable Guidelines range" as its starting point. And *Booker* did not change "how the Guidelines range is to be calculated." *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (internal citations and quotations omitted).

### A.  The Nature and Circumstances of the Offense

Defendant Simms's decades-long sexual abuse and exploitation of numerous innocent children – dating all the way back to the abuse of his daughter in 1997 – is among the most monstrous crimes that a human being can commit against children.  Simms, who was in a position of trust with respect to each of these children, committed the ultimate betrayal:  instead of protecting the children in his care, he raped and abused them while filming and photographing the devastation for his own personal trophy collection.  That collection, which exceeds 3000 images, shows the unthinkable: little girls stripped of their clothing and dignity, completely passed out with their bodies used and displayed for Simms's sexual fulfillment.  Not only did he sexually violate each of these children, but he did so after drugging many of them so that they were asleep or unconscious while being exploited, silencing his victims and enabling him to carry out his crimes without resistance.

The horror of Simms's crimes can only truly be understood after viewing the photos and videos that he produced while sexually exploiting each of these children.  While the United States has summarized the crimes described in the Statement of Offense, a written description simply cannot capture the full breadth of Simms's conduct, the vulnerability of each victim as they were exploited by Simms, or the grotesque betrayal of the tiny bodies that Simms violated for his own sexual gratification.  As such, the United States asks the Court to schedule time in advance of sentencing to view selected images associated with the offenses set forth in the Statement of Offense.

The nature and circumstances here strongly favor a sentence of life incarceration as the United States has requested:  the number of victims, the young age of each of those victims, the duration and frequency of the sexual exploitation over years, the betrayal of trust for the children

in his care, and the vulnerability of the drugged children unnaturally sleeping through all manner of abuse, including anal and vaginal penetration, calls for no less. Not only was the defendant's conduct horrific, but the fact that he plotted in advance to gain the trust of the victims and their families to commit these crimes makes his conduct particularly nefarious. Life incarceration is the only sentence that adequately reflects the nature and circumstances of Simms's crimes and is the only sentence that will guarantee that he never again sexually violates another child.

The sexual exploitation of a child is defined as a crime of violence, reflecting the reality that many child sexual abuse victims experience the same long-term trauma as victims of other types of violence, even when their bodies do not bear any visible scars. 18 U.S.C. § 3156(a)(4)(c). While the full extent of the damage suffered by Simms's victims is unknown, they will likely bear the consequences of Simms's abuse for years to come. Studies suggest that early trauma, including sexual abuse, may interfere with brain development, and can produce various neuropsychiatric symptoms commonly associated with drug use. *See* Anderson, C. M., Teicher, M. H., Polcari, A., & Renshaw, P. F. (2002): Abnormal T2 relaxation time in the cerebellar vermis of adults sexually abused in childhood: Potential role of the vermis in stress-enhanced risk for drug abuse. *Psychoneuroendocrinology, 27*, 231-244; Baynard, V. L., Williams, L. M., & Siegel, J. A. (2001): The long-term mental health consequences of child sexual abuse: An exploratory study of the impact of multiple traumas in a sample of women. *Journal of Traumatic Stress, 14*(4), 697-715 (noting that child sexual abuse victims reported a lifetime history of more exposure to various traumas and higher levels of mental health symptoms). Other studies have found that individuals who suffer sexual abuse in their childhood years have a higher rate of anxiety, disruptive behaviors, substance abuse, and personality disorders compared to others who may have experienced other forms of abuse or neglect. *See* Cohen, P., Brown, J., & Smailes, E.

(2001):  Child abuse and neglect and the development of mental disorders in the general population. *Development and Psychopathology, 13*, 981-999; Dube, S. R., Anda, R. F., Felitti, V. J., Chapman, D. P., Williamson, D. F., & Giles, W.H.(2001): Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the adverse childhood experiences study. *JAMA, 286*(24), 3089-3096 (noting that a powerful relationship exists between adverse childhood experiences and risk of attempted suicide through the life span); Merrill, L. L., Thomsen, C. J., Sinclair, B. B., Gold, S. R., & Milner, J. S. (2001):  Predicting the impact of child sexual abuse on women: The role of abuse severity, parental support, and coping strategies. *Journal of Consulting and Clinical Psychology, 69*(6), 992-1006 (child sexual abuse is a significant predictor of long-term psychological difficulties ranging from depression and anxiety to sexual problems and dissociative symptomatology).  Research also indicates that sexually abused adolescents are at an increased arrest rate for sex crimes and prostitution, and are at an increased risk for earlier pregnancy. *See* Putnam, F. W. (2003): Ten-year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry, 42*(3).

Additionally, survivors of childhood sexual abuse often experience intense feelings of guilt and shame that can affect their capacity to develop meaningful present and future relationships and can result in more guarded and cautious interactions with peers and other adults. *See* Raymond E. Webster, Symptoms and Long-Term Outcomes for Children Who Have Been Sexually Assaulted, 38 Psych. in the Schools 533, 536–39 (2001). These children often develop symptoms associated with post-traumatic stress disorder (PTSD), including general agitation, behavior disorganization, and frightening nightmares. *Id.* at 537. Children who are particularly young or rely on the perpetrator for things like emotional support can suffer particularly severe trauma that intensifies their fears, causes emotional confusion, and impedes their ability to trust others. *See id.*

at 538–39.  Even with a strong family support structure, the trauma of abuse can also "overwhelm" even "an essentially healthy functioning child who resides in a reasonably well-functioning home because [it] can disrupt the primary protective factors (such as friends, caretakers, extended family, familiar neighborhood) that protected the child initially." Webster, Symptoms and Long-Term Outcomes, at 540.

All of the research above points to one conclusion: childhood sexual abuse casts a shadow over every aspect of a child's life, well into adulthood, which is why this crime is particularly cruel. Defendant Simms has left child after child carrying the devastating and lifelong consequences of his actions.  He betrayed, raped, and abused numerous children he was entrusted to care for, all while filming and photographing his victims to curate his own extensive collection of child sexual abuse images.  The nature and circumstances of Simms's crimes are horrific and a sentence of life incarceration both justified and necessary.

### B.  History and Characteristics of the Defendant

<u>Simms's Long-Term History of Exploiting Children Necessitates a Life Sentence</u>:

Defendant Simms's long-term sexual interest in children and his history of acting on that interest by sexually abusing children over decades underscores the necessity of imposing a life sentence in this case.  As noted in the *Flower Evaluation*, "[i]n this case, the data available is quite sufficient to be confident a pedophilic disorder is present."  *See Flower Evaluation,* 9/25/24, at 10.  Focusing only on the instances for which Simms has either admitted guilt or been convicted, the indisputable record shows the following:

- 1997:  Simms sexually abused his daughter, who was approximately 6 years old at the time, by anally raping her.  *See* ECF No. 110, at 9.

- 2005:  Simms was convicted in North Carolina of two counts of Incident Liberties with a Child and one count of Felony Child Abuse Sex Act related to incidents with two different children.

- 2018-2022:  Simms engaged in the long-term sexual exploitation of numerous minor victims as detailed in the Statement of Offense.

The defendant's history of exploiting children cannot be overstated.  Simms has engaged in a long-term pattern of sexual abuse, conduct which went unchecked even after his 2005 conviction. Indeed, Simms's 2005 conviction and sentence provided him with an opportunity for change, even affording him the chance to participate in sex offender treatment.  *See Flower Evaluation,* 9/25/24, at 6.  Instead of taking the opportunity to course-correct seriously, he continued and escalated the pattern of abuse, resulting in a collection of over 3000 self-produced child pornography images created between 2018-2022. He also took measures to avoid law enforcement detection, by drugging his victims.  Additionally, the length of time he was able to remain undetected while perpetrating the abuse of these children demonstrates his ability to place himself in a position of trust with respect to the children he abuses and gain access to children time and time again.  He has demonstrated that he is a profound danger to children and is not someone who is willing to change his behavior, even after Court intervention and treatment.

The United States is relying *only* on the list offenses for which Simms has admitted guilt or been convicted of to support the request for life incarceration.  However, the remaining allegations of abuse should be viewed with the understanding that child sexual abuse is a crime that is most typically underreported.  Clinical Psychologist Darrell Turner explained the phenomena in expert testimony in 2018, testifying:

> "One of the main problems is the fact that these offenses are among the most undetected offenses that there are. This is not like bank

> robbery or murder, where it's generally assumed and expected that it's going to be detected and reported. We know from research that about only about five percent of sexual offenses against children are ever reported.
>
> Of those, of that five percent, about another five percent result in a conviction. So we're talking about an exponentially small number of offenses that are reported and accounted for.
>
> So it's sort of akin to saying there were only four drunk people in New Orleans in Mardi Gras this year because there were only four arrests for public intoxication, and it's not a good representation of what's actually going on out there. So to say it without the qualifier that, hey, this is a gross underestimate, but you know, so far, this is what we've been able to find, I think, is misleading and very, very dangerous."

*United States v. Gregory Todd Numan*, 3:160cr000065(TMB)(DAK)(February 26, 2018: Expert Testimony of Clinical Psychologist Darrell Turner, at pages 22-23.)  With that background, it is reasonable to suspect that the known conduct before the Court in this sentencing is not the complete record of all of Simms's offense against children.

Simms' ▓▓▓▓▓▓▓▓▓▓▓▓▓ is Not a Mitigating Factor

With respect to other aspects of the defendant's history, the United States contends that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as reason to impose a sentence less than life incarceration.  *See Flower Evaluation,* 9/25/24, at 5; Presentence Report, ECF No. 123, § 143.  Following his evaluation of defendant Simms, Flower explained that:

*Flower Evaluation,* 9/25/24, at 11. Thus, while experiencing childhood sexual abuse can make one more vulnerable to developing negative behaviors, the is no causal relationship between having been abused as a child and later abusing others as an adult. *See, e.g.*, Cathy Widom et al., Intergenerational Transmission of Child Abuse and Neglect: Real or Detection Bias?, 347 Science 1480 (2015), available at https://science.sciencemag.org/content/347/6229/1480.long (discussing conflicting empirical studies, including some that found "no evidence" of "intergenerational transmission of child abuse"); Chelsea Leach et al., Testing the Sexually Abused–Sexual Abuser Hypothesis: A Prospective Longitudinal Birth Cohort Study, 51 Child Abuse & Neglect 144 (2016), abstract available at https://www.sciencedirect.com/science/article/abs/pii/S0145213415003828 (finding "no specific association between sexual abuse and sexual offending" and concluding that "very few" sexually abused boys in a studied cohort "went on to become sexual offenders"); Cathy Widom, A Prospective Examination of Whether Childhood Sexual Abuse Predicts Subsequent Sexual Offending, Jama Pediatrics (American Medical Association) (January 5, 2015)("The widespread belief that sexually abused children are uniquely at risk to become sex offenders was not supported by prospective empirical evidence").

A number of studies conducted on the "cycle of abuse" theory have found that individuals who are victims of sexual abuse as a child develop empathy for others and do not commit acts of abuse when they become adults.

In a study published in 2016, researchers conducted qualitative research on male victims of sexual abuse, inquiring why they had not perpetuated the abuse on others. "By far, the most commonly cited reason the participants gave for having not sexually offended was experiencing

empathy for other people and having no desire to hurt others."[4]   When asked to explain, participants in the study made statements such as, "Experiencing pain is like putting your hand in the fire. You don't have to tell anyone twice that they are experiencing pain.  I wouldn't want to stick someone else's hand in the fire. . . I'm aware of the pain and emotions that an abused person would go through and I don't want to put anyone else through that."[5] The study's authors observed that "[s]uch evidence is unique as it directly contradicts the victim–offender cycle hypothesis because it demonstrates that not all victims become offenders and, in fact, the victimizing experience contributed to their status as a nonoffender."[6]  In other words, instead of making them *more* likely to offend against a child, being a victim of sexual abuse actually makes them *less* likely to offend because the natural empathy developed from such experiences deters such perpetuating behavior. Moreover, the same report observed, numerous studies have shown that "the majority of victims do not become sexual offenders,"[7] which "adds substantially to the argument that the pathway from victim to offender is not as direct as the literature would have us believe."[8]

Other researchers have similarly concluded that although "[t]he victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend," "there are serious limitations to this explanation."[9]  As one journal article explained it, "sexual

---

[4] Osman SL. (2011). Predicting rape empathy based on victim, perpetrator, and participant gender, and history of sexual aggression. Sex Roles 64, 506–515.

[5] *Id.*

[6] *Id.*

[7] *Id.* (citing Jespersen et al., 2009; Thomas & Fremouw, 2009; Widom & Ames, 1994; Salter et al., 2003).

[8] *Id.*

[9] Lambie, Ian, et al*., Resiliency in the victim-offender cycle in male sexual abuse*, Sex Abuse: A Journal of Research and Treatment 14(1), 43 (2002).

abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations."[10] Indeed, "the data do not provide strong support for a cycle of sexual abuse encompassing a substantial proportion of male perpetrators" and "prior victimization may have some effect in a minority of perpetrators."[11]

While it is natural to empathize with someone who has experienced childhood abuse, ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ should not serve as the basis for a more lenient sentence in this case.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and Provide Just Punishment for the Offense

A sentence of life incarceration in this case would promote respect for the law and provide just punishment for Simms's offenses. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit explained in *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010):

> This purpose--essentially the "just des[s]erts" concept--should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

*Id. quoting* S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59. As described above, the sexual abuse and exploitation of children are offenses that have lifelong, devastating consequences for the victims. A sentence of life imprisonment would provide just punishment for these offenses,

---

[10] Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect 20(3), 230 (1996).

[11] Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*, The British Journal of Psychiatry 179, 488 (2001).

promote respect for child sexual abuse and exploitation laws, and reflect the seriousness of the defendant's offenses and offenses against minor victims in general.

### D. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

Defendant Simms has an above-average risk of recidivism, and a sentence of life incarceration is the only sentence which will ensure that he never again preys on another child. As detailed in the *Flower Evaluation*, Simms presents an above-average risk of reoffending if he should ever be released. Even as he ages there is no guarantee that the risk of reoffending will be eliminated because "[n]o age is associated with a guarantee [of a] desistence in sexual offending." *See Flower Evaluation,* 9/25/24, at 10.

As part of his evaluation, Flower administered the Stable-2007 and the Static-99R to determine Simms's risk of recidivism, concluding that:

> The combination [of] Mr. Simms's Stable-2007 score and his Static-99R score results in an increase in his overall risk rating to Level IV-A, which is associated with an **Above-Average risk** [bold in original] of reoffending.

> Research on the offenders rated on both the Static-99-R and the Stable-2007 estimates that approximately 13.6% of the Level IV-A offenders would be expected to recidivate sexually within a five-year period, and that the likelihood of violent recidivism (either sexual or not-sexual) within five years of release would be approximately 31.8%.

> The risk ratings given above refer primarily to the individual's *likelihood* of recidivism. The potential severity of recidivism is also noteworthy. Given his past behavior, if the defendant were to recidivate, that recidivism could involve offenses against multiple victims, offenses against prepubescent children including very young children, drugging and/or abducting children, attempts to penetrate the victims vaginally and/or anally, the manufacture of child pornography, etc., which have the potential to cause severe physical and psychological injury.

*See Flower Evaluation,* 9/25/24, at 9-10. Thus, not only does Simms present "roughly twice the risk of the average offender," *Flower Evaluation,* 9/25/24, at 11, but the severity of any recidivism has the potential to "cause severe physicaland psychological injury." *Id.*

The government's sentencing recommendation takes into the account that Simms presents a heightened risk of reoffending should he ever be released.  This is consistent with the fact that sex offenders have a high rate of recidivism generally.  *See Lombard v. United States*, 44 F. Supp. 3d 14, 26 (D.D.C. 2014) (noting that the lower court's concerns about recidivism was supported by substantial authority (citing *Smith v. Doe,* 538 U.S. 84, 103, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("The risk of recidivism posed by sex offenders is frightening and high.") (citations omitted); *McKune v. Lile,* 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault"); *United States v. Irey,* 612 F.3d 1160, 1214 (11th Cir.2010) ("[T]he threat of recidivism by a pedophile who has sexually abused a child is appalling.") (citation and quotation marks omitted); *United States v. Allison,* 447 F.3d 402, 405–06 (5th Cir.2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.")); *see also United States v. Allison*, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders).

Given Simms's documented above-average risk of reoffending, a sentence of life incarceration is necessary to protect the public from further crimes of this defendant.  The sexual exploitation of children presents a serious danger to the community, resulting in severe mental, emotional, and physical trauma to the children who are victimized.  A life sentence would ensure that no child is ever again victimized by defendant Simms.

### E. The Need for the Sentence Imposed to Afford Adequate Deterrence

Congress, the Supreme Court, and the Sentencing Commission have indicated that general deterrence is a very important factor when considering an appropriate sentence in child pornography cases. As the Sixth Circuit Court of Appeals explained:

> "[g]eneral deterrence is crucial in the child pornography context." 591 F.3d at 834. The court elaborated that "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *Id.* (quoting *United States v. Goldberg,* 491 F.3d 668, 672 (7th Cir. 2007)). Similarly, in *Bistline I*, this court rejected the district court's determination that general deterrence would have "little [if] anything to do" with the defendant's sentence. *Bistline I*, 665 F.3d at 767 (alteration in original). Our court has thus made clear that general deterrence in the child-pornography context is not a "myth." The district court's decision to give this factor little weight was therefore unreasonable.

*United States v. Demma*, 948 F.3d 722, 731–32 (6th Cir. 2020); *see also United States v. Goodin,* 815 Fed. Appx. 860 (6th Cir. 2020) (finding no abuse of discretion where the court considered general deterrence in fashioning a sentence for an offender convicted of sexual exploitation of children).

Simms stands before this Court as someone who created over three thousand original images of child sexual abuse material depicting numerous children whom he was entrusted to protect. These are serious crimes, and the Court should consider the role general deterrence for likeminded offenders – those who have a sexual interest in children and must make the choice of whether they will act on that interest – when fashioning a sentence.

### F. The Applicable Sentencing Guidelines Range and the Need to Avoid Unwarranted Sentencing Disparities

A sentence of life incarceration is justified and appropriate here where Simms's Sentencing Guidelines range is life and where such a sentence would be consistent with that of other recent

District of Columbia defendants who have engaged in a long-term pattern of sex crimes against minors. Notable examples include:

- *United States v. Charles Clark*, 22-cr-160-CJN:  The court imposed a sentence of life on a defendant who was over the age of sixty at the time of sentencing.  There, the defendant pled guilty to one count of Coercion and Enticement, in violation of 18 U.S.C. § 2422(b), for his long-term sexual abuse of his girlfriend's daughter when she was between the ages of 13-17.  The Court imposed the sentence to run concurrent with the lengthy sentenced imposed in Charles County, Maryland, for related offenses.  Clark, who had been a law-abiding citizen prior to his arrest, only had one prior conviction which involved overlapping conduct.

- *United States v. Joseph Smith*, 19-cr-324-BAH:  The court imposed a sentence of life following a jury trial in which the defendant was convicted of all ten counts in the indictment, including Sexual Exploitation of a Child, 18 U.S.C. §2251(a), and First Degree Sexual Abuse with Aggravating Factors, 22 D.C. Code 3008, 3020(a)(2).  Smith, who was over the age of sixty at the time of sentencing, sexually abused and exploited the daughter of his girlfriend when she was between the ages of approximately 13-15.  Smith had a lengthy criminal history at the time of sentencing, including a prior Georgia arrest for sodomy that resulted in a conviction for the lesser-included offense of Simple Assault.

- *United States v. Willis Lewis*, 19-cr-307-RCL:  The court imposed a sentence of life following a jury trial in which the defendant was convicted of multiple counts, including Sex Trafficking of Minors, 18 U.S.C. 1591(a)(1), (a)(2), and (b)(2).  Lewis, who was age 49 at the time of sentencing, trafficked two minor victims, ages

16 and 17, for approximately three weeks in 2019.  Lewis did not personally engage in the sexual abuse of these minors but forced them to engage in commercial sex for his benefit.  While Lewis did have a lengthy criminal history, he did not have any prior convictions involving either sex offenses or crimes against children generally.

- *United States v. Matthew Stitt Johnson*, 22-cr-129-JMC:  The court imposed an aggregate term of 52 years, 6 months, where the defendant pled guilty to two counts of Sexual Exploitation of a Child, 18 U.S.C. §2251(a), and one count of Second Degree Child Sexual Abuse with Aggravating Circumstances, 22 D.C. Code § 3009.  Johnson, who was 31 years old at the time of sentencing, admitted to the sexual abuse and exploitation of three minor victims between approximately 2015 to 2020.  At the time of the abuse, the child victims were approximately 8 *months* old, 5 years old, and 7-9 years old.  Johnson had multiple prior convictions and arrests at the time of sentencing.

A life sentence for Simms is consistent with the sentences imposed in the above District of Columbia cases, particularly where Simms has aggravating factors that are not present in all of those cases.  Notably, Simms has victimized numerous children – far in excess of the one, two, or three victims identified in the cases above – he has engaged in a pattern of behavior dating back to 1997, he has a prior conviction for child sex crimes involving two children dating back to 2005, he was registered as a sex offender throughout the entire duration of the offenses, and the manner in which he victimized the children – including by drugging them – demonstrates an absolute betrayal of the children entrusted to his care.  A life sentence is not only fully justified by the nature

of the offense and the defendant's history but is fully consistent with the sentences of other sex

offenders in the District of Columbia.

Nationally, the sentencing ranges for pattern sex offenders are similar, although only

slightly lower.  According to the United States Sentencing Commission, Judiciary Sentencing

Information:

> During the last five fiscal years (FY2019-2023), there were 6 defendants whose
> primary guideline was §2A3.1, with a Final Offense Level of 43 and a Criminal
> History Category of V, after excluding defendants who received a §5K1.1
> substantial assistance departure. For the 6 defendants (100%) who received a
> sentence of imprisonment in whole or in part, the average length of imprisonment
> imposed was 403 month(s) and the median length of imprisonment imposed was
> 470 month(s).

These national statistics indicate that courts around the country are imposing sentences that are

effectively life for the average adult.  While a sentence of life would be above the national median,

this would not create an unwarranted sentencing disparity as the aggravating factors present in

Simms's case justify such a sentence.

### III.    The United States Asks the Court to Find Each Child Victim Eligible for Compensation through the Defined Monetary Assistance Reserve

In child pornography cases, restitution is typically mandatory to any person "harmed as a

result of" a defendant's crime.  *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930

F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015)

("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child

pornography, are entitled to mandatory restitution.").  Restitution includes "the full amount of the

victim's losses," which may include any costs incurred by the victim for:

> (A) Medical services relating to physical, psychiatric, or psychological care;
> (B) Physical and occupational therapy or rehabilitation;
> (C) Necessary transportation, temporary housing, and child care expenses;
> (D) Lost income;
> (E) Attorneys' fees, as well as other costs incurred; and
> (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015). At this time the United States is not submitting any restitution requests on behalf of victims because the United States is not in a position to calculate the "full amount of the victim's losses", as required by § 2259(b)(2)(a). This is, in part, because many of the child victims are not aware that they are victims.

Instead, the United States asks the Court to make a finding at the time of sentencing that each of the victims identified in the Statement of Offense, ECF No. 110, is eligible to receive compensation through the Defined Monetary Assistance Reserve. This Reserve, which was established pursuant to 18 U.S.C. § 2259(d), allows victims to receive up to $35,000 in compensation from the reserve. § 2259(d)(1)(D)(i). For a victim to be eligible to elect to receive Defined Monetary Assistance, three conditions must be satisfied: First, the claimant must appear in child pornography that has been trafficked. "Trafficking in child pornography" is defined in 18 U.S.C. § 2259(c)(3) by reference to statutes that prohibit advertising, transporting, distributing, receiving, or possessing child pornography, or accessing child pornography with intent to view it. Second, at least one defendant must have been convicted in Federal court of conduct (advertising, transporting, distributing, receiving, or possessing child pornography, or accessing child pornography with intent to view it) involving a visual depiction of the claimant. Third, the claimant must appear in a visual depiction that shows "sexually explicit conduct," as that term is defined in 18 U.S.C. § 2256(2)(A) and must have been under the age of 18 at the time the visual depiction was created.

Here, the United States asks that the Court find that MV1, MV2, MV3, MV4, MV5, MV6, MV8, and MV9 are all eligible to elect to receive compensation from the Defined Monetary Assistance Reserve. Each of these children is eligible where each of the three conditions is

satisfied for each child victim.  First, each of these victims appear in child pornography that has been trafficked because they appear in child pornography possessed by Victim Simms.  Second, Simms has been convicted in Federal Court of Possessing Child Pornography pursuant to 18 U.S.C. 2252(a)(4).  Finally, each child victim appeared in images depicting "sexually explicit conduct" and was under the age of 18 at the time the image was created.  Thus, the Court should find that MV1, MV2, MV3, MV4, MV5, MV6, MV8, and MV9 are all eligible to receive Defined Monetary Assistance.

Following sentencing, and provided that the Court determines that each child victim is eligible, the United States intends to file a post-sentence motion on behalf of any victim who elects to seek compensation through the Defined Monetary Assistance Reserve.

## IV.    Crime Victim's Rights Act:  The Right to Be Heard

Pursuant to the Crime Victims Rights Act (CVRA), codified at 18 U.S.C. § 3771, a crime victim has "[t]he right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding."  18 U.S.C. § 3771(a)(4).  A "crime victim" is defined as a person "directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia."  § 3771(e)(2).  Where a crime victim is under the age of 18, "the legal guardians of the crime victim…family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights under this chapter…"  § 3771(e)(2).

Undersigned counsel has informed the parents and guardians of all minor victims in this case of their rights, and the rights of their children, under the CVRA.  Based on information provided by the victims' families, undersigned counsel anticipates that multiple individuals intend to assert their rights under the CVRA at sentencing, specifically the "right to be reasonably heard."

31

As of the time of filing, one child victim has personally indicated that she wishes to be heard by the Court at the sentencing hearing. Further, the parents of two additional minor victims have indicated that they also wish to make an oral statement to the Court at sentencing. The parents of the remining minor victims have not yet decided whether, or in what way, they intend to participate but are aware of their rights under the CVRA. As such, the United States asks that the Court honor the rights of any victim or parent who seeks to be heard by the Court on the date of sentencing.

## V.    **Conclusion**

The United States submits that a sentence of life incarceration, followed by a lifetime term of supervised release, is a reasonable sentence in this case and is "sufficient, but not greater than necessary to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

Respectfully submitted,

EDWARD MARTIN
UNITED STATES ATTORNEY


        */s/ Jocelyn Bond*
Jocelyn Bond
Sarah Folse
Assistant United States Attorneys